UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CEDERIC NICHOLS | * | CIVIL ACTION |
| VERSUS | * | NO. 05-2603 |
| WEEKS MARINE, INC., ET AL. | * | SECTION "L"(5) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.  Factual and Procedural History

This case arises out of injuries allegedly sustained by Plaintiff Cederic Nichols (the "Plaintiff") on or about November 7, 2004 while he was employed as a member of the crew of the M/V ALEXANDRIA, located at the time near Charleston, South Carolina.  Specifically, the Plaintiff alleges that a cable become tangled or "birdnested" on the vessel's starboard side drum several weeks prior to the accident date due to another crewman's negligence.  The Plaintiff further claims that the vessel's captain ordered crewmen in the days leading up to his accident to untangle the cable from the drum by cutting through sections of the cable with a blowtorch and then pulling the sections free from the tangle by hand or by rope.  The Plaintiff states that the accident occurred while he was following orders and attempting to manually pull a cable section from the drum.  He alleges that as he was pulling, another cable section sprang up unexpectedly and struck him, causing him to fall approximately four feet to the vessel's steel deck and twist and tear his knee.

On June 24, 2005, the Plaintiff filed a complaint against Defendants Weeks Marine, Inc. ("Weeks Marine"), the owner of the MV/ALEXANDRIA, and Atlantic Sounding Co., Weeks

Marine's wholly owned subsidiary and the Plaintiff's employer at the time of the accident.  He seeks damages under the Jones Act, 46 U.S.C. § 688, and general maritime law for the Defendants' alleged negligence and vessel unseaworthiness.  The Plaintiff also seeks maintenance and cure and penalties for failure to timely pay maintenance and cure.

This matter came on for trial without a jury on October 25, 2006.  At the conclusion of the trial, the Court suggested that the parties try to settle the matter rather than seek the Court's judgment.  However, in late January of 2007, the Court received a letter from Plaintiff's  counsel stating that the parties were unable to settle the case.  Accordingly, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the *Federal Rules of Civil Procedure*, after careful consideration of witness testimony and exhibits in the record.  To the extent that a Finding of Fact constitutes a Conclusion of Law, the Court adopts it as such.  And to the extent that a Conclusion of Law constitutes a Finding of Fact, the Court also adopts that assumption.

## II.  Findings of Fact

(1)

Plaintiff Cedric Nichols is an individual of the age of majority and a resident of Alabama.

(2)

Defendant Weeks Marine is the owner of the M/V ALEXANDRIA, a tug boat which was performing dredging services for the United States Army Corps of Engineers near Charleston, South Carolina at the time of the Plaintiff's accident.

(3)

At all relevant times, the Plaintiff was employed by Defendant Atlantic Sounding Co., Weeks

Marine's wholly owned subsidiary, as a seaman or member of the crew of the M/V ALEXANDRA, in the capacity of AB deckhand.  The Plaintiff's job duties required a significant amount of bending, lifting and climbing.

(4)

The M/V ALEXANDRIA is equipped with a winch and two drums located on the vessel's back deck.   Some day prior to October 20, 2004, the starboard side drum's steel cable, approximately two inches in diameter and 2,200 meters in length, became tangled or "birdnested" upon the drum due to the actions of a crew member during vessel operations.   The vessel's crew used both drums when towing a barge offshore and alternated between the two drums when performing dredging operations inside, or in a bay, which was the type of work the vessel was performing at the time of the Plaintiff's accident.   After the starboard side drum's cable became tangled and the drum became unfit for its intended purpose, the vessel crew used only the port side drum to conduct towing operations.

(5)

Before an attempt was made to remove the birdnested cable, Master Captain Peter Bearb spoke with the crew regarding the method for untangling the cable, and he decided that the best procedure would be to use a Gallion crane located on an adjacent dredge.   However, this attempt proved unsuccessful and the dredge was needed for other operations.   Captain Peter Bearb also spoke with his nephew First Captain Donald Bearb and the chief engineer, Oscar Rodriguez, regarding repair of the birdnested cable before Captain Peter Bearb went off duty on November 3, 2004.   However, no new procedure was implemented before Captain Peter Bearb left the vessel.

(6)

Captain Donald Bearb thereafter took over as Master Captain following Captain Peter Bearb's departure on November 3rd, and Captain Donald Bearb devised a manual procedure to correct the problem.  Under this procedure, the vessel's chief engineer, Oscar Rodriguez, positioned himself underneath the tangled cable and used a welding torch to cut through sections of the cable approximately four to five feet in length.  Crewmen pulled out cable pieces from the tangle by hand or by hooking a rope around the section and then pulling them free.  The crewmen then placed the freed sections upon the vessel's back deck.  Captain Donald Bearb, the Plaintiff, and another deckhand all proceeded to remove the tangle in this manner in the days leading up to the accident.  No job hazard analysis was performed, as required by the Defendants' safety policy, before the crew's commencement of the manual procedure, the method that the Plaintiff was using at the time of his accident.  Nor was such analysis performed after the accident occurred.

(7)

On November 7, 2004, the Plaintiff again followed this procedure and attempted to untangle the birdnested cable under the supervision of Captain Donald Bearb, who stood approximately five feet away from the Plaintiff.  Oscar Rodriguez cut three to four foot sections of tangled cable, and the Plaintiff stood inside the brace of the H bit.  He placed one foot upon the I-beam, a four foot high ledge approximately thirteen inches wide that surrounds the port and starboard side drums, and he placed the other foot on the level winder.  As the Plaintiff pulled a piece of cable out of the tangle at the top of the starboard side drum and turned away from the tangled cable in order to drop the freed section onto the deck, another piece of cable popped out of the tangle without warning and struck the Plaintiff on the left hip.  This caused him to fall from the I-beam to the vessel's deck four

4

feet below, with much of his weight borne by his right knee.  As a result of the fall, the Plaintiff injured his right knee and was taken off the vessel to seek medical attention that day.

(8)

After the Plaintiff's accident, the vessel crew continued to untangle the cable, using a modified method.  Engineer Oscar Rodriguez, on his own initiative, began to cut pieces of cable into sections only a few inches in length.  These smaller sections fell to the deck and were thereupon retrieved by crew members.

(9)

After the Plaintiff was taken to the emergency room at a hospital in Charleston, South Carolina and a mobilizer brace was placed on his knee, the Plaintiff returned to the vessel and continued to perform light duty services for approximately one week.  The Plaintiff thereafter renewed his regular duties, but continued to complain of pain.  After the Plaintiff's hitch ended on November 17, 2004, he performed two more twenty-eight day hitches for the Defendants.  The last hitch was in April of 2005, when the Defendants temporarily reassigned the Plaintiff to a smaller tug boat, the M/V ROBERT.   The Plaintiff suffered increased knee pain due to more significant up and down movements of the tug boat and an increased amount of climbing necessary to perform duties.  The Plaintiff voluntarily left his employment on April 5, 2005 after telling Amber Barns, the Defendants' crew coordinator for the towing division, that he was not able to perform services on the M/V ROBERT due to knee pain and that he needed to see a doctor.  Captain Peter Bearb was present during this conversation.

(10)

Records from the Medical University of South Carolina Medical Center, where the Plaintiff

was first examined in the emergency room on November 7, 2004, indicate that the Plaintiff sustained fractures of the tibial plateau involving the anterior and posterior tibial spines, an avulsion fracture of the proximal fibular head, and a depression fracture deformity of the lateral tibial plateau.  The Plaintiff received treatment from Dr. Jeffrey Conrad, of the Orthopaedic Group, P.C., located in Mobile, Alabama, from January to March of 2005.  An MRI ordered by Dr. Conrad revealed that the Plaintiff suffered an avulsion of the anterior cruciate ligament ("ACL") insertion onto the tibia, a tear of the anterior horn of the lateral meniscus, a grade II sprain of the medial collateral ligament, large joint effusion or swelling, and marked bone bruising involving the lateral tibia plateau and the lateral femoral condyle, injuries consistent with the Plaintiff's accident on November 7, 2004.  During a follow up visit, Dr. Conrad was able to examine the Plaintiff's ACL by performing the Lachman's test and a pivot test.  Test results indicated that the Plaintiff's ACL was intact and functioning appropriately.  After the Plaintiff continued to suffer pain over the medial collateral ligament and lack full extension despite wearing a hinge knee brace, Dr. Conrad recommended arthroscopic surgery.  Dr. Conrad also informed the Plaintiff that treating the tibial eminence by the surgery could lead to destabilization of the ACL and possible later need for ACL reconstruction surgery.

(11)

The Plaintiff thereafter switched physicians to Dr. Daniel Seltzer, an orthopaedic surgeon located in New Orleans, Louisiana, who performed arthroscopic surgery on the Plaintiff's knee on August 2, 2005.  Surgery indicated that the Plaintiff suffered tears of the anterior medial meniscus, chrondomalacia of the patella, synovitis, and avulsion of the ACL at the tibia, but he showed no sign of ACL instability.  Following Hurricane Katrina, the Plaintiff again switched treating physicians

as Dr. Seltzer no longer provided services in the New Orleans regional area.

(12)

The Plaintiff's current physician, Dr. Billings, of Orthopaedic Associates of New Orleans, performed a meniscus cartilage clean up, but no ACL repair, on June 14, 2006.  Dr. Billings now recommends that the Plaintiff undergo ACL reconstruction surgery by Dr. Lance Estrada, another doctor in his practice.  Dr. Estrada concurs surgery is necessary, and believes that, based upon the Plaintiff's reported history, the Plaintiff's current ACL instability was caused by the accident.  Most patients are significantly limited in activity for four to six weeks after ACL reconstructive surgery, after which light or sedentary activities may be permissible.  Patients are typically released to full and unrestricted activity, or considered to have reached maximum medical improvement ("MMI"), six months post-surgery.

(13)

The Plaintiff was also seen by the Defendant's independent medical expert Dr. William Crotwell of the Alabama Orthopaedic Clinic in Mobile, Alabama on April 14, 2005 and again on December 6, 2005.  Dr. Crotwell's written report following the April 2005 visit indicates that the Plaintiff was not physically fit for duty and could not return to the vessel as a deckhand due to his knee injury, the Plaintiff was not at MMI, and the Plaintiff required arthroscopic surgery and could possibly need ACL repair surgery later.  At the December 6th visit, Dr. Crotwell reported that the Plaintiff had full extension, no effusion, solid end points, negative pivot shift, no atrophy, the avulsion had healed, and the ACL was stable.  However, Dr. Crotwell's report did not state that the Plaintiff had yet achieved MMI, but recommended that a work capacity evaluation be performed to determine if the Plaintiff was approaching MMI and could resume his full unrestricted deckhand

duties.  Dr. Crotwell did not feel the Plaintiff was at MMI as of December 6, 2005.

(14)

On August 3, 2005, the Plaintiff was paid maintenance by the Defendants for the period beginning that day and continuing until December 19, 2005 at $20 a day.  The Plaintiff is not a member of a union and thus not subject to a collective bargaining agreement between the Defendants and their union employees which includes a set maintenance rate.  In April of 2006, the Defendants back paid the Plaintiff maintenance for the time period representing April 5, 2005 to August 2, 2005, also at $20 a day.  However, this sum was offset by an amount the Defendants claim was an overpayment of prior maintenance payments.  The Defendants received Dr. Crotwell's written report from the Plaintiff's December 6, 2005 visit after December 19, 2005.  After reading Dr. Crotwell's report, the Defendants' claims officer did not believe that the Plaintiff was entitled to maintenance for the period between December 7th and December 19th of 2005.  Though the Defendants have since received Dr. Crotwell's deposition in which he states that the Plaintiff was not at MMI as of December 6, 2005, the Defendants have not taken any steps to reinstate maintenance from December 6th onwards.  In total, the Plaintiff has received $4,920.00 in maintenance payments from the Defendants.

(15)

The Defendants paid for the emergency care that the Plaintiff received at the Medical University of South Carolina, expenses associated with the Plaintiff's treatment by Dr. Conrad, and expenses associated with the Plaintiff's treatment by Dr. Seltzer.  They have agreed to pay for the ACL reconstruction surgery to the extent that the surgery costs are reasonable and customary charges that conform with existing federal Medicare rates or the United States Department of Labor

8

medical fee schedule rates in the geographic area in which the treatment is rendered.  The Defendants have not paid the Plaintiff's physical therapy bills, which include $10,000 worth of physical therapy, nor has the Defendant paid for the second surgery performed by Dr. Billings, as the Defendants state that they have not yet received those medical records and cannot perform an audit to confirm that these costs are reasonable and customary.  In total, the Defendants have paid $2,558.47 of the Plaintiff's medical bills, which exceed $37,000.00.

(16)

At the time of his injury the plaintiff was 39 years of age with a high school education.  His work life expectancy was 18 years.  His pretax wage was about $32,000.00 per year.  He worked through April 5, 2005 and has not worked since that date.  Both the Plaintiff's and the Defendants' medical experts testified that the Plaintiff should no longer perform unrestricted heavy labor, which encompasses employment as an AB seaman.  Dr. Billings recommends that the Plaintiff not perform heavy labor activity even if the Plaintiff successfully completes ACL reconstructive surgery.  Thus, the Plaintiff will likely return to some gainful activity, but will have a permanent wage loss.

(17)

The Plaintiff's prior medical history includes previous injuries to his shoulder, back and neck.  The Plaintiff dislocated his left shoulder while he was previously employed by the United States Army.  He continued his employment with the Army for approximately one year after his injury before he was honorably discharged.  He underwent surgery for the shoulder injury and applied for disability payments in 1993, which he continues to receive at a current rate of $840.00 a month.  On August 21, 1998, the Plaintiff also suffered a neck injury on the job while he worked for International Paper and he underwent surgery for continued neck pain from the injury in

December 2000.  He was also diagnosed with carpal tunnel syndrome in April of 1999, and he suffered a back injury while employed with Sea Bulk Offshore Marine on November 12, 2001.  The Plaintiff had permanent physical restrictions placed on him in 2001 after the neck surgery.  These restrictions include no lifting greater than thirty pounds, no crawling and no climbing.  The Plaintiff was also restricted to sedentary labor as a result of the back injury.

The Plaintiff did not disclose these restrictions, the injuries or the disability benefits he received when he completed the medical history questionnaire that was part of his employment application with the Defendants in April of 2004.  The Plaintiff was hired by the Defendants to perform heavy manual labor on the vessel.  In a post-offer physical examination on April 22, 2004, the Plaintiff did disclose the shoulder, neck and back injuries to the referral doctor who performed the exam.

### III.  Conclusions of Law

(1)

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, which provides original jurisdiction over admiralty or maritime claims, and the Jones Act, 46 U.S.C. § 688.  Venue is proper because the Defendants are subject to the personal jurisdiction of this Court.

(2)

The matters before this Court include determination as to whether the Defendants were negligent under the Jones Act, whether the vessel was unseaworthy under general maritime law, whether the Plaintiff is entitled to any maintenance and cure benefits above what he has already received, and whether the Plaintiff is entitled to attorneys' fees due to the Defendants' failure to

continue to pay maintenance and cure.

(3)

"To establish a claim for unseaworthiness, the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it was intended to be used." *Boudreaux v. United States of America*, 280 F.3d 461, 468 (5th Cir. 2002) (quoting *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)). "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm but a vessel reasonably suited for her intended service." *Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 339 (1955). "A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 517-18 (1971) (internal citations omitted); *see also Webb v. Dresser Indus.*, 536 F.2d 603, 606 (5th Cir. 1976), *cert. denied*, 429 U.S. 1211 (1977). A vessel is unseaworthy when a unsafe method of work is used to perform vessel services. *Rogers v. Eagle Offshore Drilling Serv.*, 764 F.2d 300, 303 (5th Cir. 1985); *Burns v. Anchor-Wate Co.*, 469 F.2d 730 (5th Cir. 1972). The duty of the vessel owner to provide a seaworthy vessel is an absolute non-delegable duty.

To recover damages from an unseaworthy condition, the plaintiff is required to establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy. *Id.*; *see also Gavagan v. United States*, 955 F.2d 1016, 1020 (5th Cir. 1992) (quoting *Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988)) ("To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a

substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.").

The credible evidence supports the finding that the starboard side drum was not fit for its intended purpose and equipment used to fix the starboard side drum was inappropriate for the work intended.  The Defendants had a non-delegable duty to provide the Plaintiff with a safe place to work and provide seaworthy equipment to repair the drum.  Additionally, the crew was ill-trained for the task of untangling the birdnested cable, and the vessel's captain ordered the crew to use an improper procedure in order to accomplish the task.  *See Comeaux v. T.L. James & Co., Inc.*, 666 F.2d 294, 299 (5th Cir. Unit A 1982) (stating ill trained crew is classic example of unseaworthiness). The Plaintiff's fall and consequent knee injury directly resulted from the condition of the starboard side drum and the improper equipment and procedure used to repair the drum.  Accordingly, the vessel was unseaworthy and the Plaintiff's injuries and resulting damages were proximately caused by the vessel's unseaworthiness.

(4)

"A seaman is entitled to recovery under the Jones Act . . . if his employer's negligence is the cause, in whole or in part, of his injury."  *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997); *see also Howard v. Canadian Nat'l / Ill. Cent. R.R.*, No. 06-30747, 2007 WL 1541011 (5th Cir. May 24, 2007).  An employer has the duty to provide his seaman employees with a reasonably safe place to work, including providing reasonably suitable gear.  *See Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989).  The cause of action under the Jones Act arises when this duty is breached and the employer's breach of duty is the "legal cause" of the seaman's injury.  *Gavagan*, 955 F.2d at 1019-20.

12

In this case, the Defendants failed to instruct or provide the crewmen with a safe method for untangling the cable. Though the Defendants' failure to follow its own procedures requiring a job safety analysis before the commencement or new phase of the job does not establish legal duty, the failure to abide by their own safety regulations certainly is relevant in determining that the Defendants failed to exercise ordinary care. The narrow I-beam that crewmen stood upon in order to tangle the cable was not an appropriate position from which to perform the work. The Defendants' construction of a platform with guards or railing, or even a safety belt, would have prevented the Plaintiff from falling four feet to the ground and injuring his knee. Alternatively, cutting the cable into sections that automatically fell to the deck would have removed the need for crew members to stand at an elevated height without proper support and would have prevented cable sections from striking crew members who were removing sections from the tangle. The Plaintiff's injuries can be directly attributed to the unsafe procedure he was ordered to perform without the proper equipment. Thus, Atlantic Sounding Co. is liable under the Jones Act for negligence.

(5)

Comparative negligence may apply to decrease the amount of a plaintiff seaman's recovery on a Jones Act claim for negligence. *Jauch v. Nautical Services, Inc.*, 470 F.3d 201, 213 (5th Cir. 2006). "A seaman's contributory negligence will not bar his recovery, but may reduce the amount of damages owed proportionate to his share of fault." *Id.* "The standard of care for a seaman under the Jones Act is to act as an ordinarily prudent seaman would act in similar circumstances." *Jackson*, 245 F.3d at 528; *Gautreaux*, 107 F.3d at 338-39; *see also Norfolk Southern Ry. Co. v. Sorrell*, 127 S. Ct. 799 (2007).

Credible evidence supports the conclusion that the Plaintiff was not negligent. The Plaintiff

13

performed the task of manually untangling the cable according to Captain Donald Bearb's direct orders and under Captain Bearb's supervision.   Moreover, "the failure of the shipowner to comply with its heavy obligation to select and furnish seaworthy appliances cannot be thus turned into a fault by the seaman." *Cox v. Esso Shipping Co.*, 247 F.2d 629, 636 (5th Cir. 1957).   There is no evidence that the Plaintiff did not remain attentive to the task or performed the procedure in a different manner than how he had been told.   Additionally, the untangling of a drum's birdnested cable is not an everyday event or routine exercise.   With no specific training other than following Captain Bearb and the other deckhand's example, it was reasonable for the Plaintiff to perform as he did.   Lastly, the Plaintiff's performance of  the task did not conflict with any of the permanent restrictions placed on him from prior injuries, and there is no evidence that the Plaintiff's failure to abide by the permanent restrictions contributed to the accident.

(6)

Under the Jones Act and general maritime law, an injured seaman is entitled to monetary recovery for past, present and future loss of earning capacity and wages, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness.

(7)

The evidence supports the conclusion that the Plaintiff has an after-tax past loss of earnings of $50,000.00 and future loss of earnings (after commuting to present value and accounting for earnings in non or light laborious work) of $150,000.00. (Def. Ex.15, Report of Kenneth J. Boudreaux, Ph.D.; Pl. Report of Nathaniel Fentress, MS, CRC, CCM).

(8)

The Defendants have paid $2,558.47 of the Plaintiff's past medical bills, which exceed

14

$37,000.00.  The Plaintiff asks for $33,480.33 in past medical expenses.  Regarding future medicals, the Plaintiff states that the ACL reconstruction surgery and post-surgery physical therapy are estimated to cost $25,000.00, of which the ACL reconstruction is estimated to cost $16,500.00.  At trial, Dr. Billings estimated that physical therapy treatment following the surgery will cost approximately $10,000.00.  The Defendants state that they will be able to negotiate a reduced rate for the ACL reconstruction surgery to be performed by Dr. Estrada based on existing federal Medicare rates or the United States Department of Labor medical fee schedule rates.  The Court finds that an award of $33,480.33 for past medical expenses and $15,000.00 for future medical expenses is appropriate.

(9)

Damages for pain and suffering may be awarded to a seaman who is injured due to the unseaworthiness of the vessel.  *Sosa v. M/V Lago Izabal*, 736 F.2d 1028, 1034 (5th Cir. 1984).  The Plaintiff has suffered physical pain due to his knee injury, two surgeries, and recovery.  He will undergo another surgery in the near future with an estimated six month recovery period.  He is likely to have knee pain in the future.  The Plaintiff also faces significant restrictions in his employment due to his knee injury, but similar restrictions were already imposed upon the Plaintiff at the time of his accident.  The Court finds that the Plaintiff is entitled to an award of $75,000.00 for past pain and suffering and $75,000.00 for future pain and suffering.

(10)

A seaman injured in the course of his or her employment has a claim for maintenance and cure.  Maintenance and cure is the implied right of the seaman arising from his or her employment relationship with the shipowner and is "independent of any other source of recovery for the seaman

(*e.g.*, recovery for Jones Act claims)." *Bertram v. Freeport McMoran, Inc,* 35 F.3d 1008, 1013 (5th Cir. 1994).  Thus, whether the seamen or employer was negligent is not at issue.  *Brister v. AWI, Inc.*, 946 F.2d 350, 360 (5th Cir. 1991); *Jauch*, 470 F.3d at 212.  Maintenance is the seaman's right to food and lodging and cure is the seaman's right to necessary and appropriate medical services, and both rights extend to the point at which the seaman reaches MMI.  *See Brees v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir. 1987) (citing *Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962)).  Therefore, the maintenance and cure duty does not extend to treatment which is only palliative in nature and "results in no betterment in the claimant's condition." *Rashidi v. Am. President Lines*, 96 F.3d 124, 128 (5th Cir. 1996).

(11)

The seaman's claim for maintenance and cure lies against the seaman's employer, which in this case, are the Defendants.  *See Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1131 (5th Cir. Unit A 1981).  If a seaman's employer willfully fails to pay  maintenance and cure, the seaman may recover attorneys' fees.  *Guevara v. Maritime Overseas Corp.,* 59 F.3d 1496, 1513 (5th Cir. 1996); *see also Vaughan*, 369 U.S. at 530-31; *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 177 (5th Cir. 2005).  In order to recover for a claim of maintenance and cure and attorneys' fees, the Plaintiff bears the burden of proving that he was injured in the course of his employment aboard the vessel, the Defendants failed to pay maintenance and cure and this failure was willful.  *See Guevara*, 59 F.3d at 1513.

(12)

The credible evidence supports the conclusion that the Plaintiff sustained an injury to his right knee on or about November 7, 2004 while working aboard the M/V ALEXANDRIA and that

he was unfit for duty as a result of this injury from April 5, 2005, the date he left the vessel M/V
ROBERT, until the time he is deemed to have achieved MMI following ACL reconstruction surgery.
The weight of credible evidence indicates that patients who undergo this surgery meet MMI
conditions within six months after ACL reconstruction surgery.  Accordingly, the Court finds that
the Plaintiff shall be held to reach MMI six months from the date that the ACL reconstruction
surgery is performed.

(13)

In order to recover maintenance, the seaman plaintiff must produce "evidence to the court
that is sufficient to provide an evidentiary basis for the Court to estimate his actual costs."  *Hall v.
Noble Drilling (U.S.), Inc.*, 242 F3d 582, 590 (5th Cir. 2001).  Provided he has incurred the expense,
the seamen is entitled to the reasonable cost of food and lodging.  *Id.* at 587.  "A seaman's burden
of production in establishing the value of maintenance is feather light: his own testimony as to
reasonable cost of room and board in the community where he is living is sufficient to support an
award."  *Yelverton v. Mobile Laboratories, Inc.*, 782 F.2d 555, 558 (5th Cir. 1986) (citing *Curry v.
Fluor Drilling Services, Inc*., 715 F.2d 893 (5th Cir. 1983)).  Lodging encompasses those expenses
"necessary to the provision of habitable housing," including heat, electricity, home insurance, and
real estate taxes.  *Hall*, 242 F.3d at 587 n.17 (citing *Gilkin v. United States*, 764 F. Supp. 270, 273
(E.D.N.Y. 1991)).  The Plaintiff's submitted bills include his monthly mortgage statement dated
September 20, 2006 in the amount of $883.48 a month, a gas bill dated October 20, 2006 in the
amount of $90.20 for the billing period September 5, 2006 to October 4, 2006, a water bill dated
October 10, 2006 in the amount of $42.21 for the billing period September 6, 2006 to October 6,
2006, and a power bill in the amount of $173.97 for the billing period August 23, 2006 to September

25, 2006.  This amounts to $29.45 a day for the home mortgage; $3.00 a day for gas; $1.40 a day for water; and $5.80 a day for power for a total of $39.65 in lodging costs a day based on a 30-day month.  This total figure represents the Plaintiff's actual costs per month of lodging and will not be pro-rated due to the fact that the Plaintiff lives with his wife and child.  *Hall,* 242 F.3d at 589 (stating fact that seaman lives with other members in household goes towards reasonableness of lodging costs and not towards calculation of actual costs).  As regards his food costs, the Plaintiff testified at trial that he spends approximately $100.00 to $150.00 a week on food, which roughly computes to an average of $18.00 per day.

The Court may look to the maintenance rates negotiated by unions as proof of reasonable costs of maintenance expenditures.  *Id.* at 587.  In this case, the Defendants paid union member employees a rate of $20.00 per day in accordance with an applicable collective bargaining agreement, to which the Plaintiff was not bound as a non-union employee.  The Court finds upon a review of all the evidence that a maintenance rate of $30.00 per day is reasonable and appropriate in this case.

(14)

As a cure award cannot duplicate tort damages, *see Boudreaux*, 280 F.3d at 469; *Brister*, 946 F.2d at 361, the Court denies the Plaintiff's cure claim as the Plaintiff has been fully compensated for medical expenses.

(15)

A seaman's willful concealment of a pre-existing physical disability may lead to a denial of maintenance and cure.  *See McCorpen v. Cent. Gulf Steamship*, 396 F.2d 547 (5th Cir. 1968).  This is because a shipowner's obligation to provide maintenance and cure, though deep-rooted in general

maritime law, is "an incident or implied term of a contract for maritime employment." *Id.* at 548. Thus, "[m]aintenance may be awarded by courts even where the seaman has suffered from an illness pre-existing his employment, but there is a general principle that it will be denied where he knowingly or fraudulently conceals his illness from the shipowner." *Id.* (internal citations omitted). In order for a shipowner to rely on the legal defense to deny the seaman's maintenance and cure claim, known as the *McCorpen* defense, the employer must establish: (1) the claimant intentionally misrepresented  or concealed medical facts; (2) the nondisclosed facts were material to the employer's decision to hire the claimant; and (3) a connection exists between the withheld information and the injury complained of in the lawsuit. *Brown*, 410 F.3d at 171 (citing *McCorpen*, 396 F.2d at 548-49).

In this case, the Plaintiff's back, neck and shoulder injuries and the permanent restrictions placed on him, including no lifting exceeding 30 pounds, no crawling and no climbing, are matters of importance which clearly would have prevented a finding that he was fit for duty as a deckhand. The Plaintiff intentionally failed to disclose his injuries, the permanent work restrictions, or the disability benefits he received when he completed a pre-employment medical questionnaire. Thus, the Defendants can clearly establish the first two prongs of the above three-pronged test. However, the Defendants cannot establish that the Plaintiff's prior injuries caused or were in any way related to his accident and consequent knee injury. No evidence exists in the record that the Plaintiff's shoulder, back, or neck area was re-injured due to the accident or that the previous injuries contributed to his accident. Thus, the Defendants are not entitled to rely on the *McCorpen* defense for denial of maintenance and cure. *See McCorpen*, 396 F.2d at 549 (citing *Hazelton v. Luckenbach Steamship Co.*, 134 F. Supp. 525 (D. Mass. 1955) (requiring causal link between undisclosed and

pre-existing disability and disability incurred during seaman's performance of vessel services for valid defense)); *Howard v. A.S.W. Well Serv*., 1991 U.S. Dist. LEXIS 21156, at *4 (W.D. La. Dec. 6, 1991) (quoted in *Brown*, 410 F.3d at 175 and stating that some connection must exist between withheld information and injury eventually sustained).

(16)

The Defendants based their decision to discontinue maintenance and also recover some maintenance payment based on their reading of Dr. Crotwell's report dated December 6, 2005.  The Defendants failed to take the appropriate steps to clarify whether the Plaintiff had reached MMI after receiving Dr. Crotwell's report.  However, the report's wording was somewhat confusing.  The Defendants also base their failure to continue payment of maintenance on the Plaintiff's willful concealment of his pre-existing injuries, permanent restrictions, and disability payments.

The Defendants' decision to delay payment of Dr. Billings' fees and physical therapy bills is due to the need for an audit to determine that these bills are reasonable and customary.  Though the Defendants did not immediately pay the bill for Dr. Seltzer, the reason for delay in payment was that the fees allegedly did not comport with reasonable and customary fees. The Defendants, after discussions with Dr. Seltzer, have since paid at a reduced rate.

The Defendants' actions do not rise to the level of willful callousness or "egregious fault" required for the Defendants to be considered liable for attorneys' fees.  *See Guevara*, 59 F.3d at 1513.  Accordingly, the Court declines to award the Plaintiff attorneys' fees for failure to pay maintenance and cure.

**IV.  Pre-Judgment Interest**

Pre-judgment interest may be awarded in admiralty cases if appropriate, and the Court finds that an order of pre-judgment interest is appropriate in this case.  "Prejudgment interest is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment."  *Jauch*, 470 F.3d at 214-15.  However, pre-judgment interest on future damages is not available.  *Id.*  The starting date and rate of interest is left to the sound discretion of the Court.  *See Doucet v. Wheless Drilling Co.*, 467 F.2d 336, 340 (5th Cir. 1972); *Marathon Pipeline Co. v. M/V Sea Level II*, 806 F.2d 585, 593 (5th Cir. 1986), *reh'g denied*, 811 F.2d 602 (1987).  The Court finds that an award of pre-judgment interest is warranted on the Plaintiff's past medical bills, past wages, and past pain and suffering.


**V.  Summary**

On the basis of the above Findings of Facts and Conclusions of Law, the Court finds that the Plaintiff sustained damages due to the Defendants' negligence and the unseaworthiness of the vessel and the Plaintiff is entitled to payment for maintenance and cure.  However, the Defendants are not liable for attorneys' fees for willful denial of maintenance and cure. Accordingly, the Plaintiff is entitled to recover the following damages from the Defendants:

(1) Past wage loss: $50,000.00;

(2) Future wage loss: $150,000.00;

(3) Past medical expenses: $33,480.33;

(4) Future medical expenses: $20,000.00;

(5) Past pain and suffering: $75,000.00;

(6) Future pain and suffering: $75,000.00; and

(7) Maintenance: $30.00 per day from April 5, 2005 until six months after the date of the Plaintiff's ACL reconstruction surgery, minus $4,920.00 for maintenance already received.

Additionally, the Plaintiff is entitled to pre-judgment interest on the above-mentioned past losses totaling $158,480.33, at the rate of 5 percent per annum from the date of judicial demand until satisfied.  Furthermore, the Plaintiff is entitled to post-judgment interest at the judicial rate from the date of judgment until paid on his future losses, totaling $245,000.00 plus outstanding maintenance payments.

New Orleans, Louisiana, this  7th  day of June, 2007.

UNITED STATES DISTRICT JUDGE